Van Brunt, J.
The parties having stipulated as to all the facts, it is not necessary to make any statement of the same, but I shall at once proceed to the consideration of the question presented for decision.
The question seems to be, has the plaintiff the right to claim that the defendant shall not obstruct the free access of vessels to the wharf erected upon the west line of West street, as mentioned in the statement of facts herein %
The first point to be considered is the title under which the plaintiff can claim the wharfage arising from the bulkhead.
It is claimed upon the part of the plaintiff that his rights to the wharfage to arise or accrue from the bulk *321 head, lies in grant and not in covenant, that it is part of the thing granted, and that it is a necessary incident to the/ee of the land granted.
In discussing this claim it will be necessary to bear in mind the exact terms of the grant.
In the deed the premises in question are described as follows : “ The other of said lots may be described as beginning at a point on the northerly line of King street ninety-eight feet westerly from the northwesterly corner of the intersection of King and Greenwich streets aforesaid at high-water mark; thence westerly along the said northerly line of King street four hundred and twenty-eight' feet to the permanent line of• West street; thence northerly along said permanent line about one hundred and fifty feet to the line of land under water, granted by the party of the first part to William Bruce, thence easterly along said Bruce’s line and parallel to King street aforesaid four hundred and fifteen feet six inches to high-water mark; thence southerly along high-water mark as it turns and winds to the place of beginning, saving and reserving, nevertheless, out of the several water lots and soil under water above mentioned, so much of the same as will be necessary to make Washington street sixty feet wide and West street seventy feet wide—the said streets to be extended and continued through the premises aforesaid, as the same shall be directed by the said parties of the first part, and agreeable to a map or plan of the premises made by John S. Hunn, city-surveyor, which is hereunto annexed.”
It is urged upon the part of the plaintiff that the foregoing claims constitutes a reservation and not an exception.
It is said that an exception is something taken out of that which is before granted, by which means it does not pass by the grant, but is severed from the estate granted ; and that a reservation is something issuing *322 out of the thing granted, and not a part of the thing granted.
These definitions undoubtedly correctly set forth the distinction between a reservation and an exception.
It is then said that in the case now before the court, the clause in the deed under discussion constitutes a reservation, because the reservation is for a street, not then in esse, to be kept for all time as a public street where none was before.
I have been unable to find anywhere anything which alludes in any way to the reservation of a street. Upon the contrary, the thing saved and reserved from the granted, is part of that which was before granted, viz.: so much of the several water lots and soil under water above mentioned as will be necessary to make Washington street sixty feet wide and West street seventy feet wide. It is not the streets which are saved and reserved, but the land under water upon which the streets were to be built, and which land under water was included in the general description contained in the grant, and by the clause in question is severed from the estate granted.
The words which follow in the saving clause, viz.: “the said streets to be extended and continued, &c.” only refer to the position of the streets in respect to the premises described in the deed.
Neither is this exception void because it is as large as the grant itself and therefore repugnant to the deed, as is the case where a person grants two acres excepting one of them. But, this exception is good, because the granting part of the deed is in general terms, and a particular part of the premises granted is excepted from the operation of the grant. In the grant of a piece of land, excepting the trees and woods, the exception is good.
“ So if one have a manor wherein is a wood called the great wood, and he grant his manor, excepting all *323 the woods and underwood that grow in the great wood and all the trees that grow elsewhere, this is a good exception” (Shepard's Touchstone, 76).
In the case of Cunningham v. Knight, 1 Barb, 399, there was a conveyance of one hundred acres, undoubtedly described by metes and bounds, “reserving and exempting seven acres from the southwesterly part of said piece of land, &c.,” and this was held to be a good exception. The only difference between this case and the one at bar being the use of the word “exempting” instead of “saving.” The common definition of the word “saving” is “with the exception of,” and this is precisely what is meant by “ exempting.”
Thus it would appear that, testing this exception by the most technical rules, there is little doubt of its validity ; but when we come to consider that at the present time the tendency of modern decisions is to give effect to the intention of the parties in a grant rather than to defeat such intent by an adherence to arbitrary rules of construction, there seems to be but little difficulty in coming to the conclusion that there was no intention upon the part of the city of New York, in these grants, to part with the fee of the streets included within their limits.
It had become part of the settled policy of this city long before this grant was made to acquire the fee to all the streets which it caused to be opened for public use, and can it be supposed for a moment that in a grant of land which it owned, it would, contrary to this settled policy, have conveyed the fee of the streets included within' the limit of the grant %
The exception contained in the deed under consideration shows that this policy was in the minds of the parties at the time of the making of the grant.
But it is argued, if the fee of that portion of the premises granted which was included within the limits of West and Washington streets was intended to be *324 reserved in the city, why did the city take a covenant from the grantee in the deed, “that the said wharves and streets shall forever thereafter continue to be and remain public streets and highways” ?—that it would be absurd to make such a covenant in respect to lands the title to which remained in the grantor.
The deed, after having given a description of the premises granted, as above mentioned, and after having set forth the terms upon which the same shall be held, proceeds as follows : “And that the said party of the second part, his heirs and assigns, or some or one of them, shall or will, at his and their own proper cost and charges, within three months next after he and they shall be thereunto required by the said party of the first part, but not until he or they shall be so required or permitted, build, erect, make and finish, or cause to be built, erected, made and finished such good, sufficient and firm wharves and streets as shall be necessary to make Washington street sixty feet wide and West street seventy feet wide, as may be included within the boundaries of the above mentioned and described water lot, or soil under water, situate on the northerly side of King street, or such other plan as may be adopted, and in such manner as shall be directed by the said party of the first part or their successors.” And after referring to other premises mentioned in the grant, not affected by this action, contains as follows : “And, also, that he, the said party of the second part, his heirs or assigns, or some or one of them, shall and will, from time to time (and at all times), forever hereafter, at his and their own proper cost and charges, pave, uphold, and keep in order and repair the said wharves and streets above mentioned; and that the said wharves or streets shall forever thereafter continue to be and remain public streets or highways, for the free and common use and passage of the inhabitants of said city, and all others passing through the same, and in *325 like manner as the other public streets or wharves of the city now are or lawfully ought to be.”
It thus appears that the grantee was to erect and build such streets and wharves as should be necessary to make Washington street sixty feet wide and West street seventy feet wide, and he was bound to keep in good order and repair the said wharves and streets, and then follows the covenant for public use, and it will be subsequently seen that the grantee was to have the exclusive right to the wharfage to arise from the wharf to be maintained by him. This covenant may have been taken as a precaution against the assertion of any exclusive right by the grantee to the wharves and streets built by him, because of the fact of their erection at his cost and expense, and his right to wharfage arising therefrom, and to place beyond controversy the rights of the public in their use, and such a construction would make harmonize all the parts of the deed, and give due effect to each.
If the construction above contended for is not a true one, what could the grantor have supposed he was saving and reserving by the saving clause above mentioned, and what did the grantee suppose was being saved % Because, if the plaintiff is right, then the whole clause is meaningless, as the covenants of the grantee compelled him to build the streets and wharves and dedicate them to public use, and this embraces the whole of the right which the city can claim in respect to these streets and wharves. It seems to me to be much more absurd to hold that it was not the understanding of the parties that the fee of the streets was not excepted from the grant, than that the covenant for public use contained in the deed was intended to set at rest any claim for the exclusive enjoyment of the streets and wharves by the grantee, because of their being built and maintained by him. The latter construction gives effect to every part of the deed, whereas *326 the former nullifies an important part thereof, which was certainly inserted for a well-defined purpose.
In the case of Borell v. Mayor, &c., 2 Bandf. 552, where the grantee in the very deed in question desired to escape taxation upon this bulkhead, it was strenuously urged upon his part that he had no fee in the land covered by West and Washington streets and the bulkheads in question, and the court expressly held, that the title to the land never passed out of the city by this conveyance, and that they were the legal owners of the bulkhead and wharf created thereon by Mr. Astor under the covenants in the grant. It is true that in the opinion the learned judge holds that the grantee’s right to collect wharfage is a grant, but a grant of what character % This plainly appears when he speaks of the grant as being a transfer by the corporation of New York to Mr. Astor of a right simply to collect wharfage, without any right to the soil. The crown having granted to the corporation of New York all the wharfage arising and to be collected from the whole island, this right to wharfage was simply a transfer of a part of this franchise.
In the case of Van Zandt v. Mayor, 8 Bosw. 375, the court expressly place the plaintiff's right to damages upon the ground that he was the owner of the fee of the land upon which the bulkhead stood, and the right to collect wharfage was a necessary incident to the fee in the land.
It is further agreed upon the part of the plaintiff, that the defendants cannot raise this question, because they have admitted in the stipulation as to facts that the title was in the grantee. The admission is as follows :
“ That the said John Jacob Astor died seized of the said granted premises, and of the improvements thereon, and of the bulkheads hereinbefore referred to.” The previous part of the stipulation is, “ that on *327 the said first day of August, 1810, the said defendants, the Mayor, &c., by various indentures or grants, bearing date on that day—copies of which are hereunto annexed, marked Schedules A, B, and 0, and made a part of this stipulation—granted and conveyed to the said John Jacob Astor the premises therein described.”
That is, the defendants admit the due execution and delivery of deeds of which copies are annexed; then, in a subsequent part of the stipulation, we find the admission that the said John Jacob Astor died seized of the said granted premises and of the improvements thereon, &c.
It is apparent that all that was intended by this stipulation was to admit that Mr. Astor had never parted with or encumbered his title to any portion of the premises granted by the deeds before mentioned or their appurtenances, and was in possession of the same, and that the word “seized” was intended to have no greater or more extended signification than this. I am of the opinion, therefore, that the right of the plaintiff to collect wharfage does not lay in grant.
I will now consider the clause in the deed under which the plaintiff must base his claim for the wharf-age. It is as follows: “And that the party of the second part, his heirs and assigns, paying and performing, keeping and observing the several covenants and agreements herein mentioned and contained on his and their part, to be paid, kept and performed, shall and may lawfully at all times hereafter, fully and freely have, use and enjoy to his and their own use, all and all manner of wharfage, benefits and advantages growing, accruing or arising by or from the wharf or wharves to be erected on the west end of the premises, being of the width of one hundred and fifty feet.”
The counsel for the plaintiff, in his argument, assumed a fact which, as far as I have been able to discover, does not exist, and that is, that the westerly line *328 of the grant is described as the permanent exterior line of the city. I find nothing in the deed which refers to any exterior line ; the only reference to a permanent line is to the permanent line of West street. There is nothing in the deed which in the most remote degree refers to an exterior line. It was well known to the parties to the deed that the city owned some two hundred feet of land under water beyond the line of West street, and only the clearest language would justify a court in holding that the city intended to make this large tract of land subservient to a grant made by them of premises much.less in extent.
The covenant in this case is that the grantee shall fully and freely use and enjoy the wharfage which shall accrue from the wharves to be erected by him. That is, he shall have the right to collect all wharfage which shall accrue from these wharves. The covenant is not that the grantee shall always be entitled to wharfage, but merely to the wharfage to accrue from the wharf which the grantee is to maintain on the west end of the premises granted, and when this west end ceased to be the exterior line of the city no wharf-age could accrue, and there would be no violation of the covenant. There is nothing in the terms of the covenant which is opposed to this construction, for the defendants have not bound themselves not to use the land outside of the wharf, nor have they anywhere covenanted that the grantee should have free access to this wharf over the land owned by them.
It seems to me, therefore, that if the right of the plaintiff to this wharfage rests in covenant, that there has been no breach of the covenant by reason of the taking possession by the city of the land outside of the wharfage and improving it.
The case of Furman v. Mayor, 5 Sandf., would cover the case on this question. In the case of Whit *329 ney v. Mayor,* the plaintiff relied upon a covenant as to wharfage almost similar to the one in question, and the court certainly did not sustain his claim, whatever else they did not decide. The force of these two cases w'as very apparent to the counsel for the plaintiff, because they base almost the whole of their argument upon the fact that the plaintiff’s right to this wharfage lies in grant and not in covenant.
The language of the act creating the dock department gives no right to compensation for interference with privileges, unless the person enjoying such privilege has such a right to its enjoyment as would preclude the city from making any use of its property which would interfere with such enjoyment.
The dock department must carry on its work ‘ ‘ without interference with the property or rights of others.” If they cannot do so, they must extinguish such rights by purchase, or by such proceedings as are provided for the taking of private property in the city for public streets or places.
There is nothing in this act which at all contemplates the making of compensation for injuries which may be sustained by adjacent premises by a lawful use by the city of its own property.
The conclusion at which I have arrived, therefore, is, that the right of the plaintiff to this wharfage resting in covenant, and the city not having in any manner covenanted not to use the land outside of the wharf, and not having given any easement over the land for the benefit of the wharf, that the defendant has invaded no right of the plaintiff in making use of the land outside of West street.
The complaint must be dismissed with costs.

 In Whitney v. Mayor, &c., of New York (N. Y. Court of Appeals, in 1855), it was held that: 1. The power of the city of *330 New York to construct piers upon the lands under water, granted it by its charter, is a legislative power, which the officers of the corporation cannot by covenant abrogate or restrict.
2. If power is given to a municipal corporation to do a thing which may affect private rights, or cause it to be done, and it is to be the sole judge of the necessity or propriety of doing it, and may direct the manner in which it shall be done, any irregularity in the proceedings does not render them-illegal, but the rights of all parties affected thereby may be enforced by action.
Where the city of New York conveyed certain lots of land then under water, and covenanted to allow the grantee to take in perpetuity the wharfage to arise from a bulkhead and street forty feet wide, he agreeing to construct such street, but before he had done so, the legislature passed acts ordaining that the street should be seventy feet wide, and at the same time enacted a provision respecting the building of piers upon lands under water belonging to the city, lying outside of the lands conveyed, which would impair the grantee’s right of wharfage under the grant of the land, but provided that if the grantee would build the piers he might have the wharfage, and he constructed the street and bulkhead opposite his land on the new line and thus became entitled to wharfage under the covenant in the deed, but did not build a pier,—Held, that he thereby assented to the qualification of his rights under the covenant and to the new system for regulating the water-front of the city, and was not entitled to damages for any injury he might sustain from the erection of a pier in front of his bulkhead by the city.
Also,—Held, that the aforesaid covenant was subject to the power of the legislature to change the water-front of the city, though it might, as an incident, impair or even render useless the rights of wharfage mentioned in the contract.
By such a covenant the city did not bind itself not to use its land outside of the premises granted, nor to do nothing which might interfere with the continuance of the wharf.
Appeal by defendant from a judgment.
This action was brought by one Whitney against the Mayor, &c. of New York, for damages for loss of wharfage caused by the construction of a pier in front of bis land, on the following state of facts.
On September 9, 1772, the defendants granted to Hendrick Rutgers a lot of land then lying under water, bounded on the north by Water street, on the west by land to be granted to Eve Provost, on the south by the East River, and on the east by Charlotte Slip, afterwards Pike Slip, containing in breadth, front and rear, twenty-six feet, and in length two hundred feet. On the same day they *331 granted to Eve Provost another lot of land, also then lying under water, bounded on the north by Water street, on the west by land to be granted to Nicholas De Peyster, on the south by the East River, and on the east by land granted to Hendrick Rutgers, containing in breadth one hundred feet front and rear, and the length two hundred feet. The last lot was immediately adjoining the first. Hendrick Rutgers covenanted in his deed that he would make a wharf or street of, twenty-four feet in breadth, on the east side of the lot conveyed to him, contiguous to, and adjoining Charlotte Slip; and Eve Provost covenanted in her deed, that she would make and build a wharf or street of forty feet in breadth on the outward part of the lot granted to her, next to the East River. Each of these wharves or streets was, by the covenants contained in the deeds, to be made on or before September 9, 1782, and the defendants covenanted in their deeds that each of the grantees should have and enjoy all manner of wharfage, cranage, benefit and advantages growing, arising, or accruing by or from the wharves to be made by them respectively. It appeared by a map, which formed a part of the bill of exceptions, that a wharf or street was made upon the westerly side of Charlotte Slip, although it did not appear by whom, or when it was built, and there was some uncertainty as to its extent and dimensions. As nothing to the contrary appeared, or was alleged, it was assumed that it was made in conformity with the covenant contained in the deed of Rutgers. There was nothing in the bill of exceptions which showed that the wharf which Eve Provost agreed to make, was built before the year 1838. A few years previous to this latter period, the defendants formed a plan for extending the street, which, in that part of the city is called South street, and which was to be made seventy feet in width, so that it would form the outer boundary of the lots granted to Rutgers and Provost, and would cross Pike Slip, formerly Charlotte Slip; and as a part of the plan, determined that a pier should be built on the westerly side of Pike Slip to extend into the East River, not to exceed two hundred and fifty feet. In order to extend South street, it became necessary to fill up Pike Slip, and for that purpose a bulkhead was built, which now forms the outer boundary of the street, and it also became necessary, for the security of the work, to build a return bulkhead, connecting with the then existing wharf on the westerly side of the slip. This was done by the defendants, under the provisions of the act of 1813 in reference to the filling up of slips. At about the same time the plaintiff in this suit, who had become the owner of the lot conveyed to Rutgers and Provost, constructed a bulkhead in front of *332 those lots, so far as it had not been done by the defendants, which also forms a part of the outer boundary of South street. After this had been done, the corporation of the city, at its own expense, constructed a pier on the westerly side of the slip, extending into the East River two hundred and ten feet, and forty feet in width. This pier adjoined the bulkhead which formed the outer boundary of South street, and covered the twenty-six feet which had been built by the defendants at the end of the wharf made by Rutgers, and fourteen feet of the adjoining bulkhead which had been constructed by the plaintiff. The plaintiff contended, and the court below held, that by the deeds to Rutgers and Provost, he became entitled to the wharfage upon the outer boundary of the lots conveyed to them, and owned by him; and that, as he had been deprived thereof to the extent of forty feet, by the construction . of the pier which had been built by the defendants, he was entitled to damages for the injury which he alleged that he had sustained.
Other material facts sufficiently appear in the following opinions.
Edwabds, J".—The bill of exceptions in this case does not present the facts upon which the rights of the respective parties must depend, with that degree of fullness "and particularity which might be desired. The statements, however, which were submitted upon the argument, relieve the case, to a great extent, from that difficulty.
[The learned judge here stated the facts substantially as above, and then continued as follows:]
The first point which is made by the plaintiff is, that the defendants professed to construct the pier in question under the provisions of the act of 1806, re-enacted in 1813, but that their proceedings have not been, in all respects, in conformity with the requirements of the statutes, and that therefore their acts were illegal. A correct understanding of the circumstances under which the -statute referred to was passed, may aid us in arriving at its true construction. The Montgomerie Charter granted to the defendants all the land lying underwater from Corlaer’s Hook to Whitehall, extending from low-water mark four hundred feet into the East River.
The defendants at an early period granted a considerable portion of this land, lying in the lower part of the city, to individuals. In the year 1798 it was deemed expedient to make a street or wharf seventy feet wide upon the extremity of the four hundred feet, which should form the outer boundary of the city. In order to prevent this object a plan was drawn, upon which the contemplated street was marked out, which was to be called South street, and, as it was supposed that the defendants did not possess adequate powers to carry their in *333 tentions into effect, a petition was presented to the legislature, which stated the importance of the projected improvement, and prayed that the necessary authority might be granted. The legislature thereupon passed an act commencing with a preamble which recited the substance of the'petition, and conferred the powers which were desired.
The act also authorized the defendants to direct piers to be sunk, and completed, at such distances as they should think proper, in front of the streets or wharves extending along the river, at the expense of the proprietors of the lots lying opposite to the places where such piers should be directed to be sunk, and if the proprietors neglected, or refused to sink, and make such piers, it was enacted that it should be lawful for the defendants to sink and make the same, at their own expense, and receive the wharfage.
In the year 1801, the defendants passed an ordinance, by which they directed the respective owners of lots fronting on South street, from Wall Street Slip to Fly Market Slip, to make a pier on the northeast side of Wall street, and complete it according to the directions therein given; on doing which it was provided that the defendants should grant the pier to the owners of the lots, reserving to the corporation the right of wharfage and slippage on the side of the pier adjoining a public slip. The grantee of one of the piers contested the right of the defendants to make such a reservation, and it was finally held to be illegal (Corporation v. Scott, 1 Caines, 548). The ground upon which'the court placed their decision was, that the land on which the pier was made bad never been granted to the defendants, it being outside of the four hundred feet given by the Montgomerie Charter; that no implied grant was contained in the act of the legislature which authorized the corporation to direct piers to be sunk, and that in giving such directions it acted merely as an authorized agent or attorney for the public. After this decision was made, and in the year 1806, an act was passed, which provided that in all cases where the defendants should think it for the public good to enlarge any of the slips in the city, they should have the power to do so, and upon paying one-third of the expenses of building the necessary piers and bridges, should be entitled, not only to the slippage on the side of the piers which should be adjacent to such slips respectively, but also to one-half of the wharfage to arise from the outermost end of the piers.
It will be seen that by this act a distinction was introduced between piers which wére built in front of lots belonging to private individuals, and piers which enlarged a slip. The reason of this distinction was, that the slips were owned by the defendants. They had originally been formed by the natural indentations in the shore, and had been re *334 served and kept open by the corporation for the public convenience. Under these circumstances, when it became necessary to construct piers for the purpose of enlarging slips, there was a manifest justice in giving the city at least equal advantages and benefits with the owners of adjoining lots. The acts which have been referred to were embodied in substance in the act of 1813, “To reduce several laws relating particularly to the City of Hew York into one act ” (2 L. 1813, 431 et seg.).
The counsel for the plaintiff contended, upon the argument, that the resolution passed by the defendants that a pier should be built on the westerly side of Pike Slip, to extend not more than two hundred and fifty feet from the southerly line of South street into the Bast River, and the notices given in pursuance of it, were defective, and he stated several specific objections, all, however, founded upon the assumption that the plaintiff had the primary right to build the pier in question, and that the defendants had no right to build it until they had given directions to the proprietors of the lots opposite to the place where the pier was to be sunk that they should build it, as is provided by the acts of 1798, 1806, and 1813. It is apparent from the course of legislation which has been alluded to, that all the statutory provisions which have been made in reference to the construction of piers, apply only to such as shall be built outside of the four hundred feet beyond low-water mark. As to piers constructed within the four hundred feet, no legislative aid was necessary, for the charter at the same time that it granted the land, also granted “full powers and authority at any time or times thereafter to fill, make up, wharf, and lay out every part thereof, and the same to build upon, and make use of as the Mayor, Aldermen, and Commonalty should think fit” (Kent's Charter, 147). It appears by the bill of exceptions that the outer line of the plaintiff’s lots extended only to the distance of two hundred feet from low-water mark, and the two hundred feet beyond his lots belong to the defendants.
It is evident, then, that the defendants had aperfect authority, under them charter, to build the pier at Pike Slip.
It existed anterior to and irrespective of any legislation on that subject. It is urged, however, upon the part of the plaintiff, that if the corporation possessed, either under its charter or by virtue of its ownership of the land, any right to construct a pier at the point in question prior to the act of 1798, such authority was surrendered at the time that the act was passed. I can see nothing which can in any way countenance such a view. It will be remembered that the plan which had been made by the defendants before they requested the passage of the act, marked out a street at the extremity of the four *335 hundred feet, and the petition which they presented to the legislature stated the difficulties which they encountered in carrying the plan into execution.
They said that they had directed a permanent street of seventy feet in width to be laid out, and completed, on the extremity of their grants already made, and thereafter to be made, on the Bast River, to be called South street; that by reason of the irregular course of the shore at low-water mark, the grants theretofore made extended to unequal distances, and that, although they were willing to give the soil under water on which the street was to be made, yet it was doubtful whether they could compel any of the proprietors of the lots fronting on the street to make it in any given reasonable time; that they also thought it desirable to extend piers at right angles from this permanent street, but that it was doubtful whether they could compel the individual proprietors of the wharves to build the piers, or whether, in case of refusal by the proprietors, the defendants could build them at the city’s expense; and they then requested the legislature to confer upon them such authority as should be proper to remove their doubts and difficulties. It appears from this that the permanent street was to be at the extremity of grants not only made, but thereafter to be made. This clearly indicated, as the fact was, that the street was to be at the extremity of the four hundred feet. They further say that, owing to the irregular course of the shore, a street of suitable regularity could not be made, that is, as I understand it, could not be made without taking some of the land beyond the four hundred feet. They also say that it was desirable to extend piers at right angles from the permanent street, but that it was doubtful whether they could compel individual proprietors of the wharves to build the piers, or whether, in case of refusal by the proprietors, the defendants could build them at the expense of the city. This also shows that the contemplated piers were to be sunk outside of the four hundred feet, for within that limit their charter gave them express authority to use the land as they should think fit. The whole petition shows, not that the defendants intended to give up any property, right, or power which they possessed, but that they required additional rights and powers. The law of 1806, in reference to piers which enlarged slips, was also evidently intended to give a right, which did not previously exist, when it was necessary to construct the slip outside of the four hundred feet, as had been decided in the case of the Corporation v. Scott (ubi sup.), and 1 Ker. 115.
The street which forms the outer extremity of the plaintiff's lots is called South street, but it is not strictly a continuation of the South street which was made upon the outer extremity of the four hundred *336 feet, and which the corporation were authorized to make by the act of 1798. That street ends at a point much below this. It was probably from not adverting to this fact that the defendants, in constructing the pier in question, appear to have intended to comply with the provisions of the statute, which, as has been seen, apply only to piers to be built outside of the extreme limits of the city, and it is entirely immaterial whether they followed the provisions of the act or not, for it had no application to the subject matter. But even if it were applicable, I have no idea that any irregularity, however great it might be, would have the effect which the plaintiff seems to suppose. The statute provides, that in all cases where the Mayor, Aldermen and Commonalty shall think it for the public good to enlarge a slip, they shall have power to do so, and it also provides that upon paying one-third of the expense of building the necessary piers, they shall be entitled to the slippage of that side of the pier which shall be adjacent to the slip, and one-half of xthe wharfage to arise from the outermost end (25 R. L. 485, p. 280). Suppose, then, that the defendants, without giving notice as directed by the statute, should, at their own expense, build a pier for the purpose of enlarging a slip, what would be the consequence ? Would it be that the building of the pier would be an illegal act, or would it be that the rights of all parties who were entitled to notice would, in all respects, be preserved ? It seems to me that the latter is the only consequence which would follow.
The power is given to the defendants to do the thing, or cause it to be done; they are the sole judges of the necessity or propriety of doing it, and they may direct the manner in which it shall be done. It would seem, then, that where there has been irregularity in the proceedings, all that the parties could claim would be their proportionate share of the wharfage—which is not the claim which is set up here. But it is not necessary to determine what would be the effect of non-compliance with the statute in a case arising under it. It is sufficient that in this case the power exercised by the defendants is not dependent upon the statute.
But it is said that the defendants have restricted themselves, by their covenants, from doing any act which shall interfere with the plaintiff’s claim for wharfage.
As has been already stated, the defendants, in tlféir deeds to Rutgers and Provost, covenanted that they and their heirs and assigns should have all manner of wharfage, cranage, benefits and advantages growing, arising, or accruing, by, or from the wharf which they agreed to make, fronting the East River. This is the covenant which is relied upon by the plaintiff, and the first question *337 which is presented is, what is its meaning and extent ? It will be remembered that the wharf to which it applied was two hundred feet within the outer line of the city, and that the two hundred feet outside of the wharf was owned by the defendants; that at the time that the covenant was entered into the city was increasing in its population and commerce, and it must then have been apparent that, at some future period, it might be expedient, if not absolutely necessary, to use the property outside of the wharf. It was in reference to this state of things that the covenant was made, and if it be so construed, it seems to me that its meaning and effect is, that the covenanters shall be entitled to the wharfage so long as the wharf shall continue to be the outer extremity of the city; that is, until the Mayor, Aldermen and Commonalty shall deem it necessary for the public good to use the land beyond it. There is nothing in the terms of the covenant which is opposed to this construction; for the defendants have not bound themselves not to use the land outside of the wharf, neither have they bound themselves that they will do no act which shall interfere with the continuance of the wharf. But, even if they had done so, such a covenant could not take away any right of the defendants to use their property in the manner in which they have done.
One of the powers given to the defendants by their charter is to make such law as to them shall seem useful and necessary for the public good, common profit, trade, and better government and rule of the city, and for the better possessing, governing, disposing, letting and selling of its lands, tenements, possessions, and hereditaments (Kent's Charter, 93). This power extended as much to the lands lying outside of low-water mark as to any other property owned by the defendants. These lands were given to them to be used for the common profit and trade of the city, especially for wharves, docks, and piers; and it was not in the power of any set of men, who for the time being might be the representatives of the corporation, to take away or abridge any of its corporate legislative authority. This the defendants derived from their charter, which to them is the permanent law. And it would be a manifest absurdity to say that, although the charter of the defendants authorizes them, in the exercise of their legislative powers, to use their property for streets, wharves, docks and piers, yet that their predecessors have deprived them of that power by the covenants which they have made with individuals. If the Mayor, Aldermen and Commonalty have entered into any such covenants they have transcended their powers, and the covenants are void. In the case of Presbyterian Church v. City of New York (5 Cow. 540), the corporation had conveyed lands *338 for the purpose of a church and cemetery, with a covenant for quiet enjoyment. The plaintiffs brought an action for covenant broken, and alleged as a breach that the defendants had passed a by-law by which the plaintiff was prohibited" from using the premises as a cemetery. The defendants justified under their charter of incorporation, and an act of the legislature of the State, which authorized it to make and pass such by-law and ordinances as they should deem necessary and proper for the regulating, or, if they should find it necessary, preventing the interments of the dead within the city. The court, in giving their opinion, said that “the defendants are considered a person in law within the scope of their corporate powers, and subject to the same liabilities and entitled to the same remedies for the violation of contracts as natural persons. They are also clothed, as' well by their charter as by subsequent statutes of the State, with legislative powers; and in the capacity of a local legislature, are particularly charged with the care of the public morals and the public health within their own jurisdiction. In ascertaining their rights and liabilities as a corporation or as an individual, we must not consider their legislative character.' They have no powers as a party to make a contract which shall control or embarrass their legislative powers and duties.” The same principle was laid down in the case of Britton v. Mayor, &c. of New York, which was decided by the supreme court of this State, but which is unreported.
If this was not so it would at all times be in the power of the body of men who for the time being should be intrusted with the exercise of the corporate powers of the defendants to effect a virtual repeal of their charter.
That the power granted to the defendants to construct piers upon the lands granted them by their charter is a legislative power, it seems to me cannot admit of a doubt. It is a legislative power granted to them to be exercised for the common benefit of all the corporators, and while the charter remains in force and is. unchanged, such power cannot be taken away, or restricted.
I think that the judgment should be reversed.
Dehio, J.—I am of the opinion that if any wrong has been done to the respondent by the acts of the corporation of the city of Mew York, which are complained of, it was committed in constructing the pier in such a manner, and under such circumstances, as to deprive him of the right to construct the same himself, so as to become entitled to the wharfage, &c., pursuant to the statute. By section 224 of the “Act to reduce several laws, relating particularly to the city of Mew York, into one Act,” passed April 9, 1813 (2 R. L. [1813], p. 433), the common council was authorized to *339 direct the construction of piers in front of the streets or wharves, extending round the water part of the city, at the" expense of the proprietors of the lots lying opposite to the place where the piers were to be constructed, within such times as they might appoint; and upon the proprietors neglecting to construct the piers so ordered, the corporation was authorized to construct them at its own expense, and in that event the city was to receive the wharfage to its own use. It is provided by section 385, that if the piers were constructed by the proprietors, they, the proprietors, were to be entitled to the wharfage.
In point of fact, the pier in question was constructed by and at the expense of the corporation, in the year 1838; and the revenue accruing from the wharfage has been ever since claimed and received by the city. Assuming that the act was a lawful exercise of legislative authority, and this was not questioned by the respondent’s counsel, the erection of the pier, pursuant to its provisions, subverted and destroyed the wharfage at the bulkhead, on the south side of South street,_ for the distance which it abutted upon that structure; and, according to the evidence, it rendered useless, for the purpose of laying up vessels, the remaining distance that the bulkhead stretched across the water part of the respondent’s land. It is stated that the respondent was not afforded an opportunity of complying with the direction of the common council, and has therefore been deprived of the benefit secured him by the statute. In support of this position, it is argued that the bulkhead ought to have been constructed in the first place, and that the proprietors could not be required to make their election until that had been done. Doubtless the bulkhead might have been finished in the first instance, but I do not see any objection in the work upon both erections proceeding pari passu, as I understand to have been the case, and it is not shown that there was any practical difficulty in doing the work in that manner. The location of the pier was sufficiently defined in the resolution of the common council. It was to be on the westerly side of Pike Slip. It was constructed so that the easterly side of the pier was in a line corresponding with the westerly line of that slip; and such I should understand to be the meaning of the resolution. It is true, that the width of the work was not given, nor the manner of attaching it to the bulkhead, nor any particulars of the manner of constructing it, and the respondent’s counsel is right in saying that sufficient data were not given to enable the respondent to go on with the work without a further understanding of the views of the common council.
Without pronouncing a definite opinion whether the proceedings of the corporation were so far regular as to put the respondent in the *340 wrong, and produce a forfeiture of his rights, it is enough to decide that, inasmuch as the pier has been constructed, the respondent’s remedy, if any, is by an action for the specific wrong he has suffered, for depriving him of the opportunity to contribute to the expense, and of having an interest in the pier to the same extent. This action assumes that the pier is an illegal obstruction to the use of his wharf, that the corporation were wrong-doers, and are to be treated in the same manner that an individual might be treated who had wantonly placed an obstruction in the river against the respondent’s wharf. I am of opinion, that if it should be conceded that the corporation failed to give the respondent the requisite notice to erect or contribute to the expense of erecting the pier, it does not follow that that structure is a nuisance or a purpresture. The corporation was the exclusive judge of the propriety of constructing piers, and of the places wthere they should be situated. This power was committed to the common council for important public purposes, having relation to the commerce of the great city of which they were the local legislature. It was, however, to be exercised with a proper regard to the interest of riparian proprietors; but the structures were to be upon the land under water belonging to the city, and not to the proprietors. It would, however, be likely to prejudice them by covering a portion of their water part; and to compensate them for this inconvenience, they were allowed to have the direct profits arising from the piers if they would be at the expense of constructing them. But it cannot be maintained that because a directing portion of the statute has been disregarded, that an important public work which the city had a general right to construct is to be therefore regarded as a nuisance. If it were situated upon the respondent’s land, the case would be different.
The tender regard which the law entertains for individual property would, in such a case, authorize the proprietors to treat the city authorities as trespassers. But it being on the land of the city, and having been erected by a body having general authority, by a public law, to decide upon its location, and to erect it, it is rightfully erected, and lawfully occupies the spot on which it is situated. If the respondent has sustained an injury in being deprived of an opportunity which the statute intended to secure him, to erect it himself, and have the wharfage arising from it, he is entitled to his action for that specific grievance. This is not matter of form, for it may be, for aught that has appeared in this case, that the enterprise of constructing the pier was a very unprofitable one, looking only at the direct revenue arising from it, and that the respondent could not, with a proper regard to his own interest, have afforded to erect it. In such a case his damage would be merely nominal. But this cause has been *341 tried and decided upon the theory that the pier is unlawfully in the river. The damages given are not those which the respondent is supposed to have suffered on account of the want of notice, and of a due opportunity to erect it, and have the profits, but such as he would be entitled to if no one had a right to erect it. Upon the principle established by the judgment, I do not see why the respondent might not rightfully demolish it as a nuisance. He could, certainly, compel the corporation to take it down, by prosecuting them daily, as in the case of a private nuisance, and that a wall, which we are bound to suppose is a public benefit and convenience, would be at the mercy of an adjoining land-owner. For these reasons I do not think the judgment can be sustained.
In Marshall v. Guion (4 Denio, 581), it was held that when a pier, belonging in part to private parties, was extended in length by the corporation, without giving the requisite notice to the proprietors of the lots, that the corporation did not own the new part of the pier, and could not grant the right to take wharfage at it. This is a different question from the present. It does not draw in question the legal existence of the pier. It is possible that, assuming that decision to be correct, the respondent might claim a portion of the wharf-age at the pier. The recovery, however, was not placed on that ground. I have assumed that the act of 1798 (Stat. c. 80, p. 459), re-enacted in 1813, as before referred to, was constitutional. The respondent’s counsel insisted that it was constitutionally valid, and that the rights of all parties are to be adjusted according to its provisions. I am satisfied this is a correct view of it. By the conveyance of September 9, 1772, the parties under whom the respondent claims had the covenant of the city to allow them to take in perpetuity the wharfage to arise from a bulkhead and street, fifty feet wide, at the southerly line or water part of the lots granted to them, of land under water in the East River, they agreeing to construct such street. This street was not made, nor does anything appear to have been done towards it until after the passage of the acts of 1798 and 1813. These acts ordained that the outer street should be seventy feet, instead of forty feet wide, and at the same time enacted the provision respecting piers, to which I have referred. It is important to remember that they were parcels of the same enactment, and that they were respecting parts of a system for regulating the water front of the city. South street was laid out accordingly, covering forty feet of the respondent’s water lot, and an additional thirty feet in the river adjoining. It may well be admitted that the respondent’s right to wharfage would attach to the water front to be created by the street, in the place of the one contemplated by the conveyances of *342 1773, subject, however, to the qualification created by the authority to erect piers. So far, it impaired the full effect of the covenants in those conveyances.
It is argued by the appellant’s counsel that the corporation could not restrain itself by contracts which should impair its authority as a municipal legislature (See 5 Cow. 539, 585, 588; 7 Id. 349; 6 Wheat. 593; 8 Cow. 146 ; MSS. opinion of Judge Nelson, in Britton v. Mayor, &c. of N. Y.). And it is said that so far as that effect was produced, the covenants were void. Without deciding that question, I think this case may be safely rested on the consent of the respondent to the new system organized by the acts to which I have referred. It was pared! of the system that the street seventy feet wide should be constructed at the expense of the proprietors of lots, and those whose grants did not extend to the new water line were authorized to fill up the land under the water to such line, and then to own it in fee simple. The respondent assented to this arrangement, and proceeded to construct the bulkhead opposite to his grants, and he thereby acquired valuable rights. By this act he assented to the qualification of his rights under his covenant, and to the new system for regulating the water front of the new city. The provision respecting piers was an important feature in that system, which the respondent, after affirming the portions which were for his benefit, cannot repudiate. That a party may waive the advantage of a constitutional provision for his benefit, is well settled (Baker v. Broman, 6 Hill, 47; Embury v. Conner, 3 N. Y. [Comst.] 511). Although I do not intend to express any opinion upon the distinction which has been taken between what has been called the powers of the corporation, or a private incorporated company, and those which they possess for the local government of a community, I am, nevertheless, of opinion that the contract in question, by which the parties under which the respondent claims title became entitled to the wharfage at the southerly end of the land under water granted to them, was subject to the power of the legislature of the State to change the water front of the city, though it might, as an incident, impair or even render useless the rights of wharfage mentioned in the contract (Charles River Bridge v. Warren Bridge, 11 Pet. 420).
.1 am of opinion, that the judgment of the court below ought to be reversed, and a venire de novo be awarded.