By the Court.
Mason, J.
The decision of this cause depends on the construction to be given to the first and second sections of the act concerning streets, wharves, and piers, in the city of New York, passed April 3, 1798.
The first section, which is substantially the same as t]ie two hundred and twentieth section of the act to reduce several laws relating particularly to the city of New York, into one act,passed April 9, 1813 (2 R. L., p. 432), authorizes the Mayor, Aldermen, and Commonalty of Now York, to lay out, according to such plan as they should agree upon, streets or wharves, of the width of seventy feet in front, of those parts of the- city which adjoin to the Hudson and East rivers, and of such extent along those rivers respectively, as they may think proper, and that, as the buildirigs of the city should be further extended, it *31 should be lawful for the said mayor, aldermen, and commonalty, from time to time, to lengthen and extend the said streets or wharves.
The second section, which forms the two hundred and twenty-first section of the act of 1813, before referred to, is as follows : “ That the said streets or wharves shall be made and completed according to the said plan, by and at the expense of the proprietors of land adjoining, or nearest and opposite to the said streets or wharves, in proportion to the breadth of their several lots, by certain days to be for that purpose appointed by the said mayor, aldermen, and commonalty, and that the respective proprietors of such of the said lots as may not be adjoining the said streets or wharves, shall also fill up and level at their own expense, according to such plan, and by the said days respectively, the spaces lying and being between their said several lots, and the said streets and wharves, and shall, upon so filling up and levelling the same, be respectively entitled to and become the owners of the said intermediate spaces of ground in fee simple.”
Gabriel Furman, the ancestor of the plaintiffs, was in his lifetime the owner of the upland opposite to the premises, in relation to which the controversy in this suit has arisen, and also by grant from the mayor, aldermen, and commonalty, of the soil under water, extending from high water mark into the river one hundred and thirty feet, beyond which there had been no grant by them at this .particular point, until the grant to Titus, after the commencement of this suit.
Ib was contended by the plaintiffs who have succeeded to the rights of their ancestor, that inasmuch as they are the proprietors of the land nearest and opposite to that particular part of South street, which is the subject of controversy, on their completing such portion of the street, and filling up the intermediate spaces, they became, by force of the above recited section of the acts of 1798, the owners of the intermediate space in fee simple.
The words of the act, it was argued,, are very clear and explicit.
In the first place, the burden, it was said, of making that portion of the exterior street, lying in front of their respective *32 premises, and of filling up the intermediate spaces, is imposed upon the proprietors, from which they cannot escape. It is not optional with them to waive the benefit proposed to be conferred on them, and relieve themselves from the burden, but in case of their neglect or refusal to perform the duty when required, as provided by.the act, the corporation of the city can do it, on their account, and collect the expense incurred therein, by distress and sale of their goods, or by a sale of their lands adjacent or opposite to the street to be made.
It was further insisted, secondly, that the persons on whom this burden is cast, are also clearly indicated by the act. They are the proprietors of the land adjoining the street to be made, or if there should be no proprietor, that is individual proprietor, immediately adjoining any portion of the street to be made, the burden is imposed on the proprietor of land nearest and opposite to the street; and lastly, it was very clear that such proprietors, on making the street, and filling up the intermediate spaces, became, as a matter of course, the owners of such spaces in fee simple. ■
It would make no difference, according to this construction, whether a proprietor of upland had taken out a grant of any part of the soil under water, or not; such proprietor, though his ownership should not extend beyond high-water mark, is as much subject to the duty imposed, and entitled to the benefit conferred by the act, as if he had taken out a grant extending to within a few feet of the street to be made, and such we understood to be the position taken by the learned counsel for the plaintiffs.
The argument is plausible, and, at the first blush, appears to be conclusive. It is, however, open to several objections.
I. It proceeds on the assumption that the corporation of the city, are not proprietors within the meaning of the act, of such parts of the land under water given them by their charter, as they had not granted to individuals. The king himself, or the government, from which the charter is derived, it was said, had no such property in the land under water, as would authorize a conveyance of it to any individual, to the exclusion of the riparian owner, and the grant in the charter, of the soil under water on the East and North rivers, extending into the river four hun *33 dred feet beyond low water mark, merely gave to the city the power of the government, substituting, as to those subjects which were of a public character, the corporation instead of the crown.
It is, however, we think, well settled, that by the common law the king is seized in fee of all the lands under .the navigable waters of his realm, and entitled to grant and convey them. He has the property tam aqua quam soli, and of all profits in the sea, and in all .navigable rivers. So the property-of the soil-in all rivers which have the flux and reflux of the sea, belongs to the king, and not the lord of the manor adjoining, without grant or prescription. But, by grant or prescription, a subject may have the interest in the water and soil of navigable rivers, as the city of London has the soil and the property of the Thames, by grant (Com. Digest, Tit. Navigation, A. B.). This right of soil is entirely distinct from, and subject to the right of the public to pass over the waters with ships : and the jus privatum does not prejudice the jus publicum wherewith public rivers or arms of the sea, are affected for public use. Such is the doctrine of Lord Hale, in his treatise, de Jure Maris, which has always been recognised, both in England and this country, as authority upon this subject, and such was held to be the law by the Supreme Court of -this State, in Rogers v. Jones (1 Wend. 237), the decision in that case being based upon the ownership by the king, of the soil under water, in an arm of the sea, and his right ,to convey the same.
If we examine the charter of the city of New York, we shall find that it does not purport merely to confer upon .the city corporation the powers of government, but gives to it an estate in fee in the soil under water. It “ gives, grants, ratifies, and confirms unto the mayor, aldermen, and commonalty, and to their successors for ever, all that space of ground and .so.rl under water,” describing it by metes and bounds with -the usual ImbendLum clause. (Kent’s Charter, § 38, p. 145, ed. 1851.) If this had been a conveyance to an individual, no question, we think, would ever have been raised as to whether these words were intended to vest in that individual the fee simple of .the soil; and we see no reason for applying -to them a different construction, because the grantee is a municipal corporation. *34 The power to take and hold lands for their own use, is expressly given to the defendants in the charter. (Kent’s Ch. § 6, p. 20, § 12, p. 38, § 37, pp. 142,3, 4.) In Rogers v. Jones, before cited, a grant from the crown of land under water, included in certain metes and bounds, to the inhabitants of Oyster Bay, was held to convey to them an estate, in fee, to such land—and the title of the corporation, under the grant in the Montgomery Charter, to the land under water around the city, to the extent .of four hundred feet from low water mark, has been held to be valid by the highest authority. (Mayor, &c., of New York v. Whitney, in the Court of Appeals, not reported.)
, It is not material, in this connection, to inquire into the .alleged right of the riparian owners, with regard to the soil ..under water, in front of their respective properties. It is not pretended that the plaintiffs are the absolute proprietors in fee ■.of such soil. The whole argument on this section proceeds on j;he ground that they are not, but that they are entitled to Recome such on1 performing certain specified acts. But if the ^defendants are such proprietors by virtue of this grant in their .charter, and have an estate in the lands of the same nature that an individual would have under a similar grant, then the foundation of the plaintiff’s argument, to wit, that the plaintiffs are proprietors of the lands nearest and opposite to the proposed street, altogether fails. The land of the defendants intervenes between the street and the plaintiffs’ land. The plantiffs do not, therefore, come within the act, and cannot be compelled to make the street nor to fill up the intermediate Space—and, of course, are not entitled to the fee of such intermediate space.
II. But there is another and more serious objection to the plaintiffs’ position. If his construction of the act be the true One, it is a most glaring violation of the rights both of the adjoining proprietors and of the corporation. It is unjust to the riparian proprietors, because it compels them, from the mere fact of their being riparian proprietors, to fill up the water lots and build a street or wharf at their own expense, and in default of their doing so, levies the expense by distress on their goods and chattels, and by sale of their real estate. If the government; or a municipal corporation by authority of the *35 government, can require this to be done when the value of the land thus reclaimed will bo an equivalent for the expense, they may also require it when such value will be no compensation, but the expense be ruinous to the riparian owners.
But the act on this construction is equally unjust to the defendants. It takes away from them all the estate conveyed to them by their charter, of the soil under water, or at the best, allows them to hold it merely as trustees for the riparian owners, until the wharf should be made. Of course, they have no right to grant the soil to any person except the riparian owner, nor to receive any quit rents, nor to reserve any ground for the streets intermediate the line of the shore and the exterior wharf, nor to require, as a condition of their grants,, that such intermediate streets be built—and this is done without any release or surrender being suggested on the part of the defendants ; but by a simple act of power, this valuable property, derived from the sovereign authority and enjoyed by the defendants for upwards of a hundred years, is taken from them, and parcelled out to the various riparian proprietors, subject to certain incumbrances. It becomes us to pause, and be well assured of the correctness of such a construction of the act. It certainly is at war with all our ideas of law and justice,, and indicates on the part of the legislature an utter disregard of those safeguards, which the constitution has thrown around private rights.
We are told, however, that the defendants have no right to complain, inasmuch as the act was passed on their application and with their assent; and we are referred to the petition presented by the corporation to the legislature previous to the passage of the act, in support of this position. If it be true that the act was passed in compliance with the prayer of the defendants, and that they were willing to surrender the property in this manner, in consideration of the powers conferred on them, of compelling the building of the exterior streets, it would present a serious question, how far they are now estopped from denying or repudiating the consequences of their own acts.
But let us see what the defendants did ask the legislature to do.
*36 The petition states, that they had directed a permanent street, ■ of seventy feet in width, to be laid out and completed at and on the extremity of their grants already made and thereafter to be made to individuals, on the East river, called South street, and on the North river, called West street; that by reason of the irregular course of the shore at low water mark, the grants theretofore made extended to unequal distances, and that although the petitioners were willing to give the soil under water, on which the streets were to be made, yet it was doubtful whether they could compel any of the proprietors of the lots fronting on these streets to make them in any given reasonable time—that they also thought it desirable to extend piers at right angles from these permanent streets, but that it was doubtful whether they could compel the individual proprietors of the wharves to build the piers, or whether, in case of refusal by the proprietors, the petitioners could build them at the expense of the -city ; and that, forasmuch as some adequate remedy was necessary in the premises, they prayed the legislature would confer on them such authority as should be proper to remove the doubts and difficulties above stated, and to make such other provision as to the legislature should seem meet.
The object, then, which the common council had in view, was to lay out permanent exterior streets, at the extremity of the grants, made and to be made to individuals. The previous issue of grants to the full extent of the four hundred feet, is assumed. It is also implied, that those grants contained covenants binding the grantees to make and build the exterior street. The difficulties complained of, were the unequal termination of the grants, rendering it impossible to make regular streets at their extremity, and the want of adequate power to compel their grantees to make the streets, within a reasonable time—the ordinary legal remedies upon a grant or lease not being sufficiently prompt or effectual to enforce the speedy completion of improvements in which the whole community was interested. They asked for no relief against riparian proprietors, or against persons whose grants did not exhaust the whole "four hundred feet—but only against their own grantees, and *37 those whose grants extended to-the full limit of the corporation’s property.
Now it is difficult, we apprehend, to argue from this petition that the common council applied, for a law which should, in effect, take away this property from them, and confer it upon the owners of the land nearest or adjoining to the exterior streets—whether mere riparian proprietors, or proprietors of some part of the land under water, by. grant from themselves— or which should in any manner impair their title to such portion of the land as they had not already conveyed. The case.. of persons in the situation of these plaintiffs, does not appear to have been in the mind of the petitioners ; they sought for no relief against such, and if the legislature have in reality taken-away from the defendants these lands, and given them to the riparian proprietors, it certainly was not done on the applicar tion of the common council.
It is not to be denied, however, that the law in question was; assented to by the defendants ; at least no act has been shown' by which they rejected or protested against it. It has, moreover, been on the statute book for upwards of half a century— and on two several occasions since its original enactment, has-, been re-affirmed and re-enacted by the legislature.
It becomes material, then, to ascertain the meaning and true construction of the act in question.
“ The only rule,” said Lord Chief Justice Tindal, in the. case of the claim to the Dukedom of Sussex (8 Lond. Jur. 795), “ for the construction of acts of parliament, is, that they should be construed according to the intent of the parliament which passed the act. If the words of the statute are in themselves precise and unambiguous, then no more can be necessary than to expound the words in their natural and ordinary sense. The words themselves, alone, do in. such case best declare the, intention of the lawgiver. But if any doubt arise from the, terms employed by the legislature, it has always been held aa a safe means of collecting the intention, to call in aid the ground and cause of making the statute, and to have recourse,’ to the preamble, which, according to Chief Justice Dyer, is a key to open the minds of the makers of the act and the misr chiefs which they intended to redress.”
*38 The doubt and difficulty in this case arises upon the terms “ Proprietors of the lands adjoining or nearest and opposite to said streets.” Who are the persons here intended ? If there should be any spaces along the shore, for which the corporation had not made any grant to individuals, would the owners of the upland fall within the description óf proprietors of lands nearest and opposite to said streets ? or is the term to be confined to those persons who had become proprietors by grants from the corporation to the full extent of the four hundred feet? The whole case turns on the answer to this question.
Let us then, with the preamble as our key, endeavor to enter into the minds of the makers of the act.
It must be premised, however, that the original grant to the corporation of the four hundred feet beyond low water mark, was made with a proviso or condition “ that of the wharves to be run out there should be left towards the East and North river forty feet broad as well for the greater convenience of trades, as at any time thereafter, for the government to plant batteries thereon in case of any necessities.” (Kent’s Charter, § 38, p. 148, ed. 1851.)
The preamble to the act then recites, First, The desirableness of having streets or wharves of seventy feet in width laid out and completed in front of those parts of the city which adjoin to the East and North rivers, and of having piers extended from said streets into the said rivers respectively. It is to be observed here, that the legislature treats all within the line of the proposed streets, including the four hundred feet of the water grant, as part of the city, and both rivers as being in fact bounded by the extremity of the four hundred feet. The preamble next recites, that the mayor, aldermen, Ac., had by petition represented that they were disposed to make the said improvements, but that difficulties had arisen as to the execution of a proper plan for that purpose from several causes, one of which is stated, viz. that from the curving and irregularities of the shore, the grants made by their predecessors were deemed to extend to unequal distances in the rivers ; that doubts had arisen whether they could compel the proprietors of lots fronting on the rivers, to make the streets and build the *39 piers within a reasonable time, and whether the petitioners could, without a breach of the conditions and covenants contained in their grants to individuals, upon the refusal or neglect of such proprietors, sink, build, and make, the piers and wharves, at their own expense, which doubts and difficulties could only be removed by the legislature. The proprietors here referred to, are proprietors of lots, not on the shore, but fronting on the river as bounded by the four hundred feet, and proprietors holding under grants from the corporation, which grants contained covenants on the part of the grantees that might be affected by the proposed improvements.
The object of the act then, as we gather it from the preamble, was two-fold. 1st. To establish regular exterior streets of seventy instead of forty feet in width, and 2d. T o compel the building of the streets by those grantees of the corporation who were proprietors of lots fronting on the rivers, that is, at the extremity of the four hundred feet beyond low-water mark on the natural shore, which was established in the charter as the boundary of the city. The preamble has no reference whatever to owners of land on the shore, or to any other proprietors, but those whose lands ran out to the full extent of the four hundred feet, for they alone could be said to be fronting on the river.
The act next proposes to accomplish the end in view, and to remove the doubts and difficulties which were represented in the preamble as standing in the way. “ Therefore,” it is added, “ Be it enacted, &c.”
And the first section authorizes the mayor, &c., to lay out such streets as “ are hereinbefore mentioned in front of those parts of the said city which adjoin to the said rivers,” using in this respect the very phraseology of the preamble, and of course in the same sense in which it is there used.
The second section declares that the streets or wharves shall be made at the expense of the proprietors of land adjoining, or nearest ánd opposite to said streets. There can be no doubt that, the proprietors of land adjoining the streets must be grantees from the corporation, or the corporation themselves, because the title to the lands under water adjoining the proposed streets, had by charter been vested in the corporation, and if it did not continue in them, must of necessity have been derived from *40 them. Without reference to the preamble it-might be a matter o-f considerable uncertainty who were the persons intended by the term “ proprietors of land nearest and opposite to the streets.” But the preamble we think solves the difficulty. It shows, as we have seen, that the act was intended to reach grantees of the corporation, who were bound to make the street in front- of their lands, but whose grants,, by reason of the irregularities of the-shore, did not all come up to the line of the proposed street or wharf. The street was to be straight. As the grants could-only extend four hundred feet beyond low-water mark, the outer boundaries would partake of the sinuosities and irregularities' of the natural shore, and there would therefore, of necessity, be, ih- many cases, a space left between the extremity of the land held under the grant and the proposed street; and the proprietors of lots which in this manner failed of reaching the streets or wharves, must be the parties mentioned in the- act as proprietors of lands nearest and opposite to the said streets or wharves, such persons had a duty imposed upon them beyond any that could have been called for by their grants from the corporation. They were required to fill up these intermediate spaces, belonging, not to the corporation,, but to the State, and by way of compensation for so doing, the State gives them the spaces thus filled up, in fee simple.
We have thus-by the aid of the preamble, we think, arrived at a satisfactory exposition of the statute. The plaintiffs’ construction makes the legislature, while proposing to accede to the wishes of the corporation, absolutely strip them of a valuable property, which at the time of the passage of the act they had enjoyed for upwards of fifty years, and bestow it upon those whom the plaintiffs term the riparian proprietors, merely upon making the exterior street or wharf.
According to the construction we have given, the legislature carries out fully and fairly the wishes of the corporation, as stated in the preamble to the act. and instead of depriving them of their property, in a summary and unconstitutional manner,, makes a further grant of their own land to the corporation grantees in order to effectuate the object in view. Nor does the act on this construction operate harshly or unjustly upon those, who had previously received water grants to the full *41 extent of the four hundred feet. If such grants called for an exterior street of only forty feet in width, although the grantees-were not released from their covenant in regard to the street, but, on the contrary, required to make a street of increased width; still, there is nothing in the act depriving them of the right to call on the corporation for compensation by reason of. this- addition to their burden, and of the loss of thirty feet in-width of their property, should it be required for the purposes'of the street; and in those cases in which the grantees were-required to fill up beyond the limits of their grants, the gifts of the land so filled up would seem to be ample compensation. On the other hand, where grants had not been, issued-, the corporation devoted to the public thirty feet in width of their own land, without any remuneration : and this is what we suppose-is meant by the declaration in their petition, “ that they were willing gratuitously to give the soil under water on which those-streets of seventy feet were to be made.” A new remedy, it is. true, was given to enforce ,a compliance by the grantees with-their covenants in relation to building the street, but that was-rendered necessary from the fact that their performance was-matter of public concern, and it was not meet or proper that the interests of the community should suffer from the neglect,, or the-inability, of any of the individual grantees.
We have entered into this examination of the statute with much more minuteness, and at greater length than may appear to be necessary ; but the question we have discussed, is ojio of great difficulty, on which we confess we, at first, had serious-doubts, and it was due as well to the ability with which the-cause was argued' on both sides, as to the large interests-involved, to state fully and particularly the grounds on which we rest our decision.
If we have given the true construction of the act, the plaintiffs must fail—their claim is founded upon the title which they allege they acquired by virtue of the second section. They arano t, however, as we have seen, the proprietors-contemplated by that section—they have no land adjoining, or nearest and opposite to South street—and not coming within the purview or meaning of the act have no duties imposed upon them by it,, and are not entitled to any benefit which it confers.
*42 There is one argument in support of the plaintiffs’ construction of the act which remains to be noticed.
It was urged, with great earnestness, by at least one of the counsel, that the plaintiffs were riparian owners, and that persons standing in that relation were entitled to the soil under water opposite to their upland, as their own property—that the title and interest of the government, and of course of the corporation, cannot override this inherent right of the riparian owners to the soil—that if the grant to the corporation in the charter was made with intent to vest the'fee in them in derogation of the rights of the riparian owners, it was void, as against them, and that the act of 1798 did nothing more than restore to the riparian owners that which had been previously taken from them, improperly and without right.
It might be' successfully answered in the present case, that whatever may be the general doctrine on this subject, these plaintiffs cannot be considered riparian owners. The charter which contained the grant in question was executed in 1732, and was confirmed by the constitution of 1777. The plaintiffs derived their title from the state, under conveyance by the •Commissioners of Forfeiture in 1784, more than fifty years after the date of the charter, and eight years after its confirmation by the constitution. The charter had established, the permanent line of the river at four hundred feet beyond low water mark, and had provided that a street or wharf should be built at the extremity of those four hundred feet, so that in contemplation of law the real side or bank of the river was, not the natural, but the legal or artificial boundary. The plaintiffs’ ancestor purchased with knowledge of this fact, or is chargeable with knowledge of it, and with knowledge therefore that his front on the river was liable to be cut off by the formation of this exterior wharf, under a title prior to his own. He was not as against the defendants the riparian proprietor, but they, the defendants, by virtue of their prior title, were themselves bounded on the line established by the sovereign power, and thus were the true riparian owners.
But we prefer to place our answer to this objection on broader grounds. We deny the position of the plaintiffs’ counsel altogether.
*43 It results from the nature of the estate of the crown, or the government, in the property, that the riparian owner does not possess this right. There cannot be two owners to the same piece of land. Lord Hale quotes two decisions, in which the claim of the riparian proprietor, as against the king, was held to be invalid. (P. 13.)
If the crown has the estate in fee, it follows also, that it can be granted. There is no such qualification in the books, that the soil cannot be granted to any person but the riparian proprietor. Lord Hale expressly says, that the king may license the erecting of quays, or other buildings, on the sea-coast, even below the low water mark, where they are not in fact annoyances or nuisances (Hale de Portibus Maris, 85. Hale de Jure Maris, 22), and that without the qualification contended for by the plaintiffs.
It is requisite, for the sake of commerce, that this power should exist. The necessary improvements, such as the erection of wharves and streets, on the river adjoining a great city, demand it. The Colonial Government, with a wise forethought, made provision for the erection of the necessary wharves and docks for this city, more than one hundred years ago ; and under that provision, the execution of which was committed to municipal authorities, the necessary wharves and streets have been, from time to time, erected as the public wants required. If the property, then, is vested in the government, or the Corporation by grant from them, there seems to be no reason why they may not deal with it as with any other property which they own, and ask for it a price proportioned to its value. The plaintiffs admit the right of the state to insist on the erection of wharves by the riparian owners, as the condition of the grant, and have no objection to a quit rent, provided it be a small one. If any quit rent can be reserved, the amount of it must, from the nature of the case, be discretionary ; and if a quit rent, why may not a sum, in gross, be demanded? The utmost that the owner of the upland can ask, is the first offer—the preemption—but if he declines to buy, and no grant can .be made to any other person in the event of his refusal, then he has the power to dictate the terms upon which the grant shall be made. This cannot be, especially where the *44 interests of commerce are so greatly concerned, as in the present case. The plaintiffs have had all that they could in law or in equity ask, the first offer of the property on terms adjudged to be fair and reasonable, by the public officers appointed, for the purpose. This offer they declined, and if they have lost the property, they have only themselves to blame.
A single word as to the wharfage. The counsel for the plaintiffs argued on the supposition that the grant made to Fur-man, contained an absolute and unqualified grant of wharfage for ever. The grant extended only to Front street. It was perfectly well known to all the parties at that time, that the permanent line extended further into the river, and that the charter contemplated the building of South street at the extremity of the line, whenever the wants of the public demanded it. Now the covenant in the grant is not that the grantee should always be entitled to wharfage, but merely to the wharfage to accrue from Front street. Of course, when Front street was no longer an exterior street no wharfage would accrue from it, and the covenant would not be violated ; it would only be rendered inoperative, by reason of an event contemplated by both parties when the covenant was made.
The result of the whole is, that the bill must be dismissed; but we do not think the plaintiffs ought to be charged with costs.