WALTER LANGDON, Appellant, *v.* THE MAYOR, Aldermen AND COMMONALTY OF THE CITY OF NEW YORK AND Others, Respondents.

*New York city — grant of lots under the waters of the Hudson river — when the city cannot thereafter change the permanent wharf line to the detriment of its grantee.*

In 1810, the city of New York, acting in pursuance of the power conferred upon it by acts of the legislature passed in 1798 and 1807, conveyed to John Jacob Astor, who then owned a tract of land fronting upon the Hudson river, a parcel of land adjoining the same on the west and lying under the waters of the Hudson river. The land conveyed was described as running to " the permanent line of West street," and thence northerly along the said permanent line, etc. The deed contained a clause " saving and reserving out of the several water lots and soil under water above mentioned so much of the same as will be necessary to make Washington street sixty feet wide and West street seventy feet wide." The streets were to be made and constructed by the grantee, his heirs and assigns, when required so to do by the city, and when so constructed they and the wharves were to be by them kept in repair and " continue to be and remain public streets or highways for the free and common use and passage of the inhabitants of the said city and all others passing through the same, and in like manner as the other public streets or wharves of the said city now are or lawfully ought to be." The deed conveyed "all and singular the profits, advantages, emoluments, hereditaments and appurtenances unto the said water lots and soil under water and premises belonging or in any wise appertaining," and declared that " the said party of the second part, his heirs and assigns, paying and performing, keeping and observing the several covenants and agreements herein mentioned and contained, on his and their part to be paid, kept and performed, shall and may lawfully, at all times hereafter, fully and freely have, use and enjoy, to his and their use, all and all manner of wharfage, benefits and advantages growing, accruing or arising by or from the wharf or wharves to be erected on the west end of the premises, being of the width of one hundred and fifty feet."

In an action to recover damages for the action of the city authorities in erecting a structure on the west of the lot, extending 175 feet further into the river, thereby destroying the value of the right to collect wharfage conferred by the deed :

*Held,* that the deed, when considered in the light of the surrounding circumstances, was intended to confer upon the grantee, his heirs and assigns, so long as he and they complied with the covenants and conditions therein contained, the permanent right and easement of collecting wharfage, and all the benefits and advantages growing, accruing or arising by or from the wharf or wharves to be erected on the west end of the premises conveyed, and that the city had no right to thereafter change the permanent wharf line and extend

the same further out into the river, even though the title to the land under water to be covered by the extension had been vested in the city by an act of the legislature passed prior to the time of the making of the conveyance. (BRADY, J., dissenting.)

It was also declared to be the true intent and meaning of the grant that it, " or any words or anything herein contained, shall not be deemed, construed or taken to be a covenant or covenants on the part and behalf of the said parties of the first part or their successors."

*Held,* that the effect of this clause would probably be, to require a provision in the deed, which was expressed in the form of a covenant, to be construed as a grant.

APPEAL from a judgment dismissing the complaint, entered upon a trial at the Special Term.

*Charles F. Southmayd* and *R. S. Emmett,* for the appellant.

*James C. Carter,* for the respondents.

DANIELS, J.:

The object of this action was somewhat diversified, as it was presented by the complaint, but as the facts now exist it is substantially to recover the value of a servitude or right to collect wharfage on so much of the westerly line of West street, as was included in a deed executed by the mayor, etc., of the city of New York, to John Jacob Astor, on the 1st of August, 1810. The plaintiff in the action has succeeded to Astor's rights and title under the deed, and was vested with them at the time when the acts were performed by the dock department of the city, by which the right to collect wharfage upon this line has since been subverted and defeated. By these acts the westerly water line of the city, in the vicinity of this land, has been extended 175 feet further into the Hudson river, by a structure, builded upon the east, upon the west line of West street. This structure is fixed and permanent in its character, and it has rendered the westerly side of West street entirely useless for the purposes of the servitude, or right to receive wharfage for its use by vessels navigating the river. The plaintiff, consequently, is entitled to maintain his action for the value of the right or privilege of which he has been so deprived, if the title created by the deed to Astor is sufficient for that purpose. At the time when it was made, the grantee in it was the owner and proprietor of the lands above high-water mark, adjacent to the land since acquired by

the plaintiff, and the deed itself was apparently executed to him conformably to the policy existing in the State, to give such proprietors the pre-emptive right to acquire the title to land under water, situated directly in front of and adjoining their property. This deed, by its terms, seems to have been intended as a permanent disposition of the property described in it. It was, in fact, a perpetual lease, by which an annual rent was reserved on account of the conveyance made of the property, and upon the same consideration other burdens were imposed upon the grantee, his heirs and assigns. The property entering directly into the consideration and determination of this controversy is that which was secondly described in the deed. It commenced at a point in the northerly line of King street, ninety-eight feet westerly from the north-westerly corner of the intersection of King and Greenwich streets at high-water mark. The line then proceeded westerly along the northerly line of King street 428 feet, to what is designated in the deed as "the permanent line of West street;" thence northerly along said permanent line about 150 feet to the line of land granted "etc., to William Bruce." This land was then entirely under the high water of the Hudson river, and the design of the conveyance was to vest the title to it in the grantee, so far as it should not be included within the bounds of projected streets called Washington street, sixty feet wide, and West street, seventy feet wide. As to the land required for the construction of these two streets, the conveyance was qualified by the following clause: "Saving and reserving nevertheless, out of the several water lots and soil under water above mentioned, so much of the same as will be necessary to make Washington street sixty feet wide and West street seventy feet wide; the said streets to be extended and continued through the premises aforesaid as the same shall be directed by the said parties of the first part," etc. These streets were to be made and constructed by "the grantee, his heirs or assigns" "at his and their own proper cost and charges within three months next after he or they shall be thereunto required by the said party of the first part." And he and they, "or some or one of them" (it was declared), "shall and will from time to time and at all times forever hereafter, at his and their own proper cost and charges, pave, uphold and keep in good repair the said wharves and streets above men-

tioned, and that the said wharves or streets shall forever thereafter continue to be and remain public streets or highways for the free and common use and passage of the inhabitants of the said city, and all others passing through the same and in like manner as the other public streets or wharves of the said city now are or lawfully ought to be."

It has been claimed on behalf of the defendants, that the saving and reserving of the soil under water for these streets, so far created an exception in favor of the city, and that probably was the intention which prompted their use. For while the term "reserving" would not be attended with that result, the addition of the word "saving" requires a broader construction to be given to the phrase made use of, for that term, by its ordinary signification, is the equivalent of the word "excepting." But if this be not the true construction which should be given to this clause, no substantial change will result from it in the right of the plaintiff in the case; for whether it operated as a simple reservation of the right to use the lands devoted to the streets only for the purpose of such streets, or an exception of the land itself was also made by means of it, it was still the intention of the instrument to confer upon the grantee, his heirs and assigns, the right to an important privilege or servitude upon the westerly bounds of the land over which West street was designed to be constructed. For as to the land described "all and singular the profits, advantages, emoluments, hereditaments and appurtenances, unto the said water lots and soil under water and premises belonging, or in any wise appertaining," were granted by means of the deed. And it was further declared that "the said party of the second part, his heirs and assigns, paying and performing, keeping and observing the several covenants and agreements herein mentioned and contained, on his and their part to be paid, kept and performed, shall and may lawfully at all times hereafter, fully and freely have, use and enjoy, to his and their use, all and all manner of wharfage, benefits and advantages growing, accruing or arising by or from the wharf or wharves to be erected on the west end of the premises, being of the width of one hundred and fifty feet." It was the clear and unequivocal design of the conveyance that these rights and privileges should pass by means of its terms, subject, of course, to the conditions

expressed in or to be implied from the other portions of the instrument, and whether the land within the bounds of these streets was saved and excepted, or a reservation only of the privilege of using it for streets was what was secured by the deed, such rights and privileges were still completely and effectually provided for the grantee, his heirs and assigns. The effect of the language used to accomplish that result will not be changed, even though it should be construed to rest in covenant on the part of the grantor. But that such a construction should be placed upon it appears to be in conflict with one of the concluding portions of the conveyance. For it was there declared to be its true intent and meaning "that this present grant, or any words, or anything herein contained shall not be deemed, construed or taken to be a covenant or covenants on the part and behalf of the said parties of the first part or their successors." And the effect of this restriction would probably be to require the preceding clauses, which have already been mentioned, to be construed as grants, even though one of them may have been expressed in the form of a covenant. For it is the duty of the court to carry into effect the intention of the parties, as that may have been expressed upon this subject. It is not requisite that the term "grant" should be made use of for the purpose of creating such a conveyance, but it is sufficient that it shall appear to have been the intention of the parties in fact to grant the interest, title or privilege claimed to have been conveyed. (4 Kent [7th ed.], 546; *Shove* v. *Pincke*, 5 Term, 124; *Mack* v. *Patchin*, 42 N. Y., 167.) And such a grant was a proper form of conveyance to vest in the grantee incorporeal hereditaments, such as reversions, rents and services, not being of a tangible nature and existing only in contemplation of law. (4 Kent, 544.)

And this was regarded to be the nature of such an instrument in *Boreel* v. *Mayor, etc.* (2 Sandf., 559). This case it is true has, to a certain extent, been since overruled, but it was not upon this point, the soundness of which has never been questioned.

The terms by which this privilege or servitude was created and secured to the grantee of freely having for his own use, or that of his heirs or assigns, the wharfage, benefits and advantages growing, accruing or arising by or from the wharf or wharves to be erected on the west end of the premises, was declared to be one of a perma-

nent and continuing character, for it was in terms stated that he or
they, on the condition only of the performance of the covenants
and agreements resting upon them, should at all times thereafter
have such wharfage, benefits and advantages. No limitation in
point of time as to the extent of this right was either expressed in,
or is to be implied by construction from the terms by which it was
created. And the other provisions and conditions contained in the
deed contemplate the same unlimited duration, and that the right
was intended to be granted in perpetuity. Indeed, the conveyance
in all the arrangements provided for by it, and all the structures
to be erected and maintained under it, discloses only the intention to
create perpetual rights and secure the observance of like obligations.
The title to the land not affected by the saving and reservation for
the two streets was practically conveyed in fee. So were the priv-
ileges accompanying it, for both were in terms vested in the grantee,
his heirs and assigns, for their proper use, benefit and behoof for-
ever; and they were, for the same indefinite period of time, to
uphold and keep such streets and wharves in good order and repair;
and these wharves, as well as the streets, were to continue and remain
public streets or highways of the city, the same as the other public
wharves or streets then were or lawfully ought to be. That these
rights, privileges and obligations were intended to be permanent in
their nature is further evident from the provisions of the deed relat-
ing to the construction of the pier on the continuation of the north
line of King street, for this was the only practical qualification
attached to the maintenance of the westerly line of West street as a
perpetual wharf; the wharfage from which was secured to the
grantee in the deed, his heirs and assigns. A further confirmation
of the design to create perpetual rights and privileges by this deed
is found in the circumstance that the westerly line of the property
described in it is mentioned as " the permanent line of West street."
The southerly line of the land was projected in terms to this desig-
nated " permanent line," and the northerly line is in similar terms
carried along such permanent line, and the westerly wharf, of the
width of thirty feet, to be constructed in King street, was to extend
to the same permanent line. What could have been the object of
designating this as a permanent line, if it was not intended to be the
exterior water line of the city, it is not easy to perceive, for the

westerly line of west street, as a line, could be no more permanent in its nature than the easterly line, or either of the lines of Washington street, and neither 'could be any more properly designated as permanent lines than the other, unless something more than the line itself, as that of a street, was intended to be understood. All lines of streets, when no other intention concerning them can be shown, are intended to be permanent, and it is not necessary that such an intention should be expressed in order to render them so. This phrase was clearly unnecessary for that purpose, and from the manner in which it has been used in the deed, it is not to be presumed that it was not employed without the design of securing to it some appropriate office in the instrument beyond that of a mere designation of the westerly line of West street. The more probable intention to be derived, not only from the phrase itself, but from the other clauses in the deed indicating that the westerly line of the street was to be perpetually maintained as a wharf, is that it was intended to be understood as designating the exterior water line of this portion of the city. The land intended to be affected by the conveyance is also stated to be shown by the map or plan annexed to it, and on this map or plan this line is not only in terms again designated as the permanent line, but beyond that no possible structure is in any form shown to have been contemplated in the waters of the Hudson river beyond this line, except the pier extending from it on the continuation of the north line of King street. Besides that, the yearly rent required to be paid by the grantee or his heirs for these rights and privileges is in terms reserved forever.

It is clear from these clauses, grants, conditions, obligations and phrases, that what the parties designed by this instrument was that the rights, privileges and interests shall be as continuous as the conditions to which they were in terms subjected, and the obligations imposed upon the grantee, his heirs and assigns, which were declared to be extended forever, or for all time thereafter, and thereby precluding all expectation that the water front of the city at this point would ever afterwards be changed.

The obligation to construct a wharf on the westerly line of West street, and at all times forever afterwards to uphold and keep it in good order and repair, and the right at all times to have, use and enjoy the wharfage from the wharf or wharves erected on the west

end of the premises conveyed, was clearly and specifically provided for in direct terms, which cannot be subordinated to any condition or contingency not expressed or employed in the deed. It has, on the contrary, been framed in such language as preclude all reasonable grounds for supposing that it was contemplated by the parties that this westerly line would ever, under any circumstances, be afterwards in any manner changed in its location. The inference, on the other hand, is that the line designated was intended and understood to be the permanently fixed water line of this part of the city, for in no other manner could these rights, privileges and obligations be attached to it as they have been provided for in the deed, and the line itself could not otherwise, with any propriety of language, be mentioned as the permanent line.

The circumstances attending the making and execution of this deed are consistent with no other just construction of its terms than that which has already been indicated. Before it was executed, a plan had apparently been devised for locating and designating the permanent water line of the city. To promote that object, an ordinance was passed by the common council in February, 1796. That is stated to have proceeded upon the report of the street committee to the board, of " a description from actual survey made of an outer street along the west side of the city, which is to be of the breadth of seventy feet, and beyond which no grants ought to be made and no buildings erected." The report appears to have been read and approved, and the statement of its effect was followed by the courses and directions of the proposed street. A difficulty probably arose in the way of carrying this ordinance into effect, for in 1798 the common council presented a petition to the legislature for the passage of an act securing to the city authority to carry the same design into execution. In that petition, it was stated that " your petitioners have lately directed a permanent street, of seventy feet wide, to be laid out and completed at and on the extremity of their grants already made and hereafter to be made to individuals on the East river, called South street, and on the North or Hudson river, called West street, south and west of which streets no buildings of any description are to be erected, so that vessels lying at the wharves may be secure from fires." It was further stated that the preceding grants extended to unequal distances into both rivers,

occasioning difficulties in making the permanent streets mentioned regular, although the petitioners were willing, gratuitously, to give the soil under the water on which such streets were to be made. It was further represented by the petitioners "that part of their plan was to extend piers at right angles from the said permanent streets into the river, at proper distances from each other," with suitable bridges for the accommodation of sea vessels, and so constructed as to admit the currents of both ebb and flood in both rivers; that doubts had arisen whether they would " be authorized to sink and build those piers at the expense of the city and receive the wharfage, without incurring a breach of the conditions and covenants contained in their grants to individuals." This petition was followed by the passage of an act in 1798 (ch. 80), in which its substance was recited, which it is not necessary now to repeat, and authority was, in terms, thereby conferred upon the mayor, etc., of the city, "to lay out, according to such plans as they shall or may agree upon or determine, such streets or wharves as hereinbefore are mentioned, in front of those parts of the said city which adjoin to the said rivers, and of such extent along those rivers respectively, as they may think proper," and "to lengthen and extend the said streets or wharves." And beyond the construction of the streets or wharves, they were also authorized "to direct piers to be sunk and completed at such distances and in such manner as they, in their discretion, shall think proper, in front of the said streets or wharves," "to be connected with the same by bridges."

This ordinance of the common council, together with their petition and the act in terms following it, clearly contemplated the streets which were provided for as permanent water lines of the city, which were to be no otherwise interfered with or in any form defaced or obstructed than by the construction of the piers extending from them further into the rivers. If any doubt could possibly arise as to this being the intention from the general phraseology made use of, it would be removed by the statement in the report adopted by the common council that no grants ought to be made and no buildings erected beyond the outer line of the streets to be created, and the enactment of similar import in the seventh section of the act of 1798, by which it was declared "that no buildings of any kind or description whatsoever (other than the said pier

and bridges) shall at any time hereafter be erected upon the said streets or wharves, or between them respectively and the rivers to which they shall front and adjoin." The improvements which were so provided for were required either to be made by the persons owning the lots lying adjacent to them, or if they failed to do that, then by the mayor, etc., of the city, at the expense of such owners.

The entire theory pervading this ordinance, petition and legislative act, is the same as that which was incorporated in this deed. The latter was an execution and embodiment of the authority which the legislature had provided should be enjoyed and exercised by the grantors in the instrument, and they both, in all their parts, clearly confirm the construction already given to the deed that the permanent line mentioned in it was designed to be the exterior or outer water line of the city, and that whatever might be appropriately performed to carry this plan into effect, would be permanent and perpetual in its nature.

The act of 1807 (chap. 115), transferring the title to 400 feet of the land under water to the city bears no further upon the effect of this conveyance than merely to supply, if that was necessary at all after the passage of the act of 1798, the title to the property upon which it would legally be made operative. For nothing was contained in this act of 1807, requiring the exterior water line of the city to be projected farther than it might be by complying with the terms and following the intentions of the act of 1798.

The structure placed in front of the westerly line of West street was not one of the piers which, by this act and the terms of the deed, could be extended from that line into the river, but it was compact in its character, rendering the bulkhead resting on that line entirely useless as a source of revenue or wharfage to the plaintiff in the action, for it extinguished all possibility of using it in any manner for securing emoluments of that nature. And if the deed was, as it has been held to be, a perpetual grant of the servitude or privileges so destroyed, it would follow, necessarily, that the plaintiff should be compensated for the loss sustained by him in consequence of its destruction.

This case differs very essentially both in the language employed in the deed and the circumstances attending its execution from

those relied upon in support of the judgment. In that of *Whitney* v. *Mayor, etc.* (6 Abb. N. C., 337, note), the grant was made when it was held to have been "apparent that at some future period it might be expedient, if not absolutely necessary, to use the property outside of the wharf. It was in reference to this state of things that the covenant was made," and for that reason it was considered that the covenant securing the wharfage to the grantees, their heirs and assigns, was dependent upon the possible future action of the authorities of the city. The same view was followed in the case of *Furman* v. *Mayor, etc.* (5 Sandf., 16); for while it was intimated in that case that the act of 1798 was designed to create an exterior water line the plaintiff still failed, because it was considered that his right to wharfage was dependent upon the future adoption and settlement of such a permanent water line for the city. Upon that subject it was said that "the grant extended only to Front street. It was perfectly well known to all the parties at the time that the permanent line extended further into the river, and that the charter contemplated the building of South street at the extremity of the line whenever the wants of the public demanded it. Now, the covenant in the grant is not that the grantee shall always be entitled to wharfage, but merely to the wharfage to accrue from Front street. Of course when Front street was no longer an exterior street no wharfage will accrue from it, and the covenant would not be violated. It would only be rendered inoperative by reason of an event contemplated by both parties when the covenant was made." (Id., 44.) And this decision was affirmed by the Court of Appeals, where it was held that Furman, by his grant, "took nothing but what was included within the described boundaries of his deed, and there is no covenant which prevents the corporation from using in such way as they please the residue of the land remaining in them and extending several hundred feet further into the river. With respect to such land they have the same rights as any other owners." (*Furman* v. *Mayor*, 10 N. Y., 568, 569.)

In *Marshall* v. *Guion* (1 Kern., 461) this point was not presented. Its decision depended wholly upon the right to wharfage at the extreme water line of a wharf which had been constructed by the city in front of that to which alone the plaintiff had title; and because of that circumstance it was held that he had no right to the

wharfage, and the court expressly disclaimed all intention of considering or determining the controlling point now in controversy in this case. The two preceding cases, in which the right of the city to extend its wharves, notwithstanding its grants, were disposed of entirely upon the circumstance that the grants were required, by the facts under which they were given, to be so construed as to be subordinated to the future right of the public authorities to extend the water lines of the city beyond the limits of the grants made. They were not designed, and were not stated, to be permanent or final in this respect, and the parties receiving them did so with that understanding. While, in the present case, both the conveyance itself and the act under whose authority it appears to have been given contemplated that the westerly line of the streets provided for should be permanent and final as the water lines of the city.

This deed was an entirely proper exercise of the authority which the municipal government of the city had received from the legislature, for the entire scope and purpose of the act of 1798 was that the improvements provided for by it should be made at the expense of and for the benefit of the adjacent proprietors, with the single exception of the piers extending from the permanent line into the river. If such owners failed to make the improvements as they should be directed by the city authorities to do so, then the latter were authorized to make them and charge the expense against, and collect it from the former, and it was accordingly provided that the streets and wharves to be so filled up should become the property of the owners of the intermediate spaces of ground, in fee simple. As to the piers themselves, extending from the permanent line into the river, and which would occupy but small divisions of that line, if such proprietors neglected or refused to make them, then that might be done by the mayor, etc., of the city, who were afterwards entitled on that account to wharfage for all vessels that might, at any time or times, lie at or be fastened to such piers. This was the only case in which the proprietors of the adjacent lots could be deprived of the benefits of any part of the improvement, and it is the only instance in which they were even contingently excluded from the right to wharfage. The presumption therefore arises, that, as to the other improvements which were to be made at their expense, their right to collect wharfage for the use of the

wharf standing on the permanent or exterior line, was intended to· be conceded. The deed, as it was executed, was no broader in these respects than the law allowing it to be made. For that reason it was not obnoxious to anything contained in the restriction that its· true intent and meaning, as that was declared, was only to pass the estate, right, title and interest which the municipal authorities had, or lawfully might claim, by virtue of their several charters. For· they did have, and lawfully had the right to claim all the proprietary interests, privileges and servitudes which were granted by the con- veyance, and the grantee, his heirs and assigns were, in terms, protected against any obstruction to their enjoyment by the provi- sion contained in the seventh section of the act of 1798, declaring that no building of any kind or description whatsoever, except the piers · and their bridges should, at any time thereafter, be erected between the said streets, or wharves, and the rivers to which they respectively should front and adjoin. The extension of this wharf, made by the department of docks of the city, was within the declared restraint of this section of the statute, for it was a build- ing other than the piers and bridges mentioned in the act, placed between the wharf itself and the river: It not only violated the terms of the grant, but in addition to that, exceeded the prescribed bounds of this preceding act of the legislature. And within the law, as it was stated to be. in *Van Zandt* v. *Mayor, etc.* (8 Bos., 375), that entitled the plaintiff to redress, because of the rights he was deprived of through the intervention of this structure.

The right granted to the grantee in the deed, and to his heirs and assigns, to collect wharfage for the use of the wharf standing on the westerly line of West street, was of a proprietary nature (*Smith* v. *Mayor, etc.*, 68 N. Y., 552), and the plaintiff, as the person succeeding to it, could only be deprived of it by a compliance with the provision of the Constitution, in effect declaring that private property should only be taken for public use, by making for it a just compensation. (Const. State N. Y., art. 1, § 6.) By virtue of that authority, and that alone, the legislature had the power to provide for divesting the plaintiff of this servitude or privilege, by which he had become entitled to the perpetual right to wharfage, for the use of the exterior line of the wharf mentioned in the deed, when- ever that might be deemed proper for the promotion of the public

interests by the extension of the water front of the city. But his right to this wharfage under this deed, and the exercise of this authority over it, was contingent only upon the circumstance that he should be compensated for its value when he was deprived of it. Under that restriction it was entirely at the disposal of the power of the legislature. (*Brooklyn Park Com'rs* v. *Armstrong*, 45 N. Y., 234.) And this was evidently the view upon which the enactment of chapter 574, Laws 1871, proceeded, under which the department of dock determined to extend the exterior water line of the city at this point 175 feet farther into the river, and conformably to their determination upon this subject, the obstruction which is now complained of was placed by the department beyond the westerly line of West street. For this act did not empower the department or the city itself, in the exercise of its authority, to disregard, or without compensation supersede privileges or rights previously granted. On the contrary, it was provided that the department of docks might, in the name of the city, acquire for the benefit of the corporation any and all wharf property to which it had no right or title, and any rights, terms, easements and privileges pertaining to any wharf property in the city, not owned by the corporation. That was authorized to be done, either by agreement, or if it could not be accomplished in that manner, by means of such proceedings as would carry out the policy and observe the restriction of the Constitution to which reference has already been made. (Laws 1871 [vol. 2], 1237, sub. 4 of § 6.)

These provisions contemplated the existence of just such rights and privileges as had become vested in the plaintiff, and they indicate the policy of the act to have been that they should not be disregarded, but, on the contrary, should be made the subject of compensation in case their extinguishment should become necessary for the purpose of exercising the authority and carrying out the policy newly provided for by this act. It may prove burdensome to the city to require it to submit to this restriction of what has been claimed to be its rights, but under its own grant, and what has been done by the grantee, his heirs and assigns, according to its terms, to render it effectual, no other determination can properly be made. The plan prescribed and devised at the instance of the city by the act of 1798, was, at the time, designed to be fixed

and permanent in its nature, and that design remained unchanged when the deed in question was executed and delivered, and also when the improvements were made by the grantee for the purpose of complying with what had been required on his part. The rights of the parties from that time became fixed. The grantee had derived a property in the emoluments to be obtained by the use of the wharf which he had erected upon the west line of West street. Under the plan of the act of 1798, and the terms of the deed, that right of property was intended to be perpetual, as long as the conditions in the deed should be performed, and neither the grantee, nor his heirs or assigns, could be divested of it while they made no default in the performance and observance of these conditions without compensating them for it, as so much property taken for the use of the public. No such compensation has ever been provided or tendered to the plaintiff in this action. Neither has any proceeding been taken under the act of 1871, to divest the title to such emoluments accruing to him through this deed, and it necessarily results, therefore, that he is entitled, under these circumstances, to maintain an action to secure redress for the loss sustained by him through the unauthorized acts which appear to have been performed, and by which this wharf front has been rendered useless to him.

It appears from the case that the city has kept up, repaired, maintained and renewed the streets described in the terms of the grant, and that the grantee and his successors in title kept the bulkhead of the wharf in repair. Why the streets themselves were not kept up, paved and maintained by the grantee, his heirs and assigns, in performance of the obligations for that purpose imposed upon them by the terms of the deed, has not been made to appear, neither is any advantage claimed in the case by the defendants because of that circumstance. But if the city took it out of their hands and did this work at its own option, and without any default on their part, no advantage whatever could accrue to it in this controversy, by reason of that circumstance.

No ground appears in the case upon which the judgment dismissing the plaintiff's complaint can be sustained. The deed was a legal exercise of the power of the municipal authorities as such instruments have been conceded to be in the cases where they

have been brought before the courts for consideration. Under it a valuable right, privilege or servitude was acquired, the title to which it was clearly intended should continue in perpetuity. The dock department of the defendant has deprived the plaintiff of it in a manner not authorized or warranted by the laws of the State. This loss entitled him to be compensated for the value of the right, privilege or servitude of which he has been divested, and to recover his compensation the present action may properly be sustained.

The judgment in the case should be reversed, and a new trial ordered, with costs to abide the event.

BARKER, J., concurred.

BRADY, P. J.:

The corporation of New York is duplex in character, combining corporate and political or legislative capacities, the corporate power *eo nomine*, being always subservient to the legislative. The corporation, for example, may contract for the laying out of a public highway when authorized by the legislative power, but it cannot by covenant or deed impair the use of the street, or grant any franchise relating to it, nor can the use of it be limited, restricted, or in any way controlled by such an element.

In the exercise of its legislative power, therefore, the corporation can authorize an act which, if done without such sanction, would be *ultra vires;* and the consideration of this power is an all important one in reference to the result of this appeal. It comes to the front at once, for it seems to be very clear that the grant of 400 feet under water, from low-water mark along the eastern and western shores of the island, was one given, and must be so regarded, for purposes connected with its maritime advantages or commercial necessities; and more particularly the extreme eastern or western line of the grant, the use of it to be designated in the first instance by legislation, either State or municipal. It is, consequently, especially subject to the legislative control of the corporation. The grantee of any fee, therefore, the subject matter of which is connected with the streets or highways, takes his title with knowledge of this duplex character of the corporation, and subject, therefore, to the superior power of legislation over it. It follows from this

that when the municipality determined, by a map or plan, that West street should be a permanent street on the west side of the island, it did not, either by that circumstance or any other, including the grant under which the plaintiff claims, bind itself not to widen the street declared to be permanent, and if it attempted to do so in either capacity by covenant, the covenant would be invalid as a usurpation of legislative power over the highway, in the one instance, and in the other invalid as an attempt to restrict the legislative power.

The grantee, with this knowledge, takes a limited fee, if any, the life of which depends upon the legislative will, and assumes all the consequences of the contingency which may destroy it.

The original grantee, under whom the plaintiff claims, took it, therefore, subject to contingencies, but might well have undertaken to do all that the covenant enjoined upon him for the franchises created, and in the expectation, realized in this case no doubt, that its enjoyment would be long enough to compensate him for the pecuniary outlay which he might be called upon to make. The grant, therefore, and the intention of the parties making it, must be construed with reference to our system of double powers resident in the corporation, to which reference has been made.

When the grant was given there was outside of the alleged permanent line of West street, nearly if not quite ·200 feet of land under water, the use of which might in time be imperatively demanded by the increasing commerce or the growth of the city, or some other incident of importance, the event depending upon circumstances which could not be anticipated. It certainly did not enter into the minds of the contracting parties when the grant was made, under which the plaintiff claims, that the grantee was to enjoy under it a grant extending to the exterior line of West street under any and all circumstances, no matter how it might be changed, and if deprived of it that he was to be compensated by damages for the deprivation. This would in effect be a grant of the whole 400 feet, and would extend a well defined area by implication far beyond the original boundary.

There is a marked distinction, as suggested by the learned counsel for the city, between property of a private nature held by a municipal corporation for its private advantages, and that held by it of

a public nature. The latter cannot be aliened or encumbered so as to defeat the exercise of the public duty or trust for which the property was bestowed. The 400 feet of which the grant under consideration embraced a part was clearly of a public nature, and was to be controlled by the corporate performance of the public duty or trust.

For these reasons I regard the opinion of Judge VAN BRUNT as expressive of the rule which should govern the case. I am aware of the apparent violation of the covenants in the grant made by the city. But this ceases to be of import when the grantee is chargeable with notice of the powers surrounding the grant, its character and its possible defeasance and destruction, owing to the exercise of such powers.

I am aware also that the question discussed is one of great importance, both to the plaintiff and to the defendants, and have not failed to appreciate the difficulties of the situation. But my examination of the questions, and my reflection upon them, compel me to the expression of the opinion thus briefly rendered.

Judgment reversed, new trial ordered, costs to abide event.